## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**Medve Energy Ventures LLC**           **Case No. 6:17-cv-01336**

**Versus**                              **Judge Michael J. Juneau**

**Warhorse Oil & Gas LLC et al**        **Magistrate Judge Carol B Whitehurst**

## REPORT AND RECOMMENDATION

Before the Court on referral from the district judge is a Motion To Dismiss filed by Defendants, Steven W. Kent II and Jana Kent ("the Kents") [Rec. Doc. 42]; a Memorandum In Opposition filed by Plaintiff, Medve Energy Ventures, LLC ("Medve") [Rec. Doc. 47]; and the Kents' Reply thereto [Rec. Doc. 52]. For the reasons that follow, the Court will recommend that the Motion be GRANTED IN PART AND DENIED IN PART.

## I. Background

Plaintiff, Medve, filed this action against Warhorse Oil & Gas, LLC ("Warhorse") as well as Steven Kent II and Jana S. Kent, individually, both officers of Warhorse, regarding certain mineral leases referred to as the Granier Prospect area in Cameron Parish, Louisiana. Medve held a 70 percent working interest in an oil well located on land in the Granier Prospect area. *R.1.* Medve alleges that at the time this suit was filed, the Kents owed over $1.1 million dollars in subcontractor

liens on the well's production. Medve further alleges the Kents defrauded Medve by hiding Warhorse's worsening financial condition from its working interest partners in the Granier Prospect well (Medve) which lead to the continuation of Warhorse incurring debt and failing to pay its subcontractors. Plaintiff asserted six counts against Warhorse and the Kents, individually: (1) breach of contract, (2) fraud, (3) violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), (4) conversion, (5) unjust enrichment and (6) specific performance.

On December 15, 2017, Warhorse filed a voluntary petition for relief under chapter 7 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Louisiana. *R. 9, 9-1*. On June 15, 2018, the Bankruptcy Court entered the Parties' agreed-upon Order lifting the automatic stay as it applies to the Kents in their individual capacities. *Case No. 4:17-bk-51631 [Rec. Doc. 115]*. Thus, the Kents in their individual capacity are the only defendants in this action.

On February 23, 2018, the Kents filed a motion to dismiss Medve's Complaint against them for failure to state a claim. They contended the Complaint was devoid of any material factual allegations against them necessary to support any of the alleged claims. Medve argued that its allegations of fraudulent conduct committed by the Kents give rise to causes of action against them for common-law fraud, LUTPA, conversion, breach of contract and unjust enrichment. The Court held that Medve's allegations as to Steven and Jana Kent were conclusory and without

2

specific facts as to their personal involvement in Warhorse. The Court dismissed the motion to dismiss without prejudice and allowed Medve to file an amended complaint, giving the Kents an opportunity to file a motion to dismiss the amended complaint if they deemed appropriate.

Medve filed a First Amended Complaint on September 21, 2018 consisting of 40 pages. *R. 41.* The Kents filed a Motion to Dismiss the First Amended Complaint stating that Medve's "exhaustive description of Warhorse's business failings … again omits any specific allegations concerning any representation—much less any fraudulent misrepresentation—made personally by the Kents to Medve."[1] *R. 42, p. 6.* Medve responded in its Opposition that its Amended Complaint consists of 40 pages because "so much detail" is included in order "to satisfy the Rule 9(b) pleading standard applicable in cases of commercial fraud perpetrated over a period of time" which it contends this case represents. *R. 47, p. 7.*

Medve's First Amended Complaint and the twenty-seven (27) Exhibits attached thereto, *R. 47; 47-1- 47-27*, provide the following:

Medve contends that the Kents were motivated by a desire to close a more lucrative deal in another segment of the oil and gas industry rather than serving as an oil & gas well operator. *R. 47.* This separate and new oil and gas industry business

---

[1] The Kents' Motion to Dismiss the Amended Complaint addresses only the Fraud, Alter Ego and Single-Business Enterprise claims made by Medve. Thus, the Court will not address Medve's claims of breach of contract, LUTPA, conversion, unjust enrichment and specific performance.

venture was in connection with Produced Water Transfer, in which the Kents were the "developer, owner and operator of a water gathering and disposal platform that transfers and disposes of produced and flowback water" in Shelby County, Texas, and serving the Cotton Valley and Haynesville shale formations there (the "Produced Water Transfer Deal").[2] *R. 41, ¶¶ 31-34.* Due to Warhorse's deteriorating financial condition in mid to late 2015, however, the Produced Water Transfer Deal was in jeopardy of falling apart. *Id. at ¶¶ 24-25, 53-54, 73, 80.* In order to hide their worsening financial condition, the Kents, who had reserved all significant managerial control to themselves, *Id. at ¶¶ 21, 22,* manipulated certain customary relationships and ways of doing business in the oil & gas industry so they were no longer conducted at arms-length between entities under separate control; instead they were conducted entirely within the confines of a multi-entity business enterprise.    *Id. at ¶¶ 11-14, 16, 35-40, 42-44.* In order to do this, the Kents approached and ultimately purchased an already established drilling entity with its own drilling rigs. *Id. at ¶ 11.* They purchased Crown Drilling, Inc. ("Crown Drilling"), a drilling company they had used to procure a significant amount of oil well drilling previously at a legitimate arms-length basis, and to whom they had incurred significant debt. *Id. at ¶ 42.* Medve contends this was "the single most

---

[2]  The website https://www.businesswire.com/news/home/20171219005363/en/Produced-Water-Transfer-Closes-100-Million-Strategic, dated December 19, 2017, confirms Medve's allegation that "Steven Kent II President and CEO of Produced Water Transfer" closed a $100 million partnership deal with Orion Energy. *R. 41, ¶ 33, FN 2.*

important lynchpin business type to the scheme they devised." *R. 47, p. 7.* The Amended Complaint further alleges Crown Drilling was specifically targeted for acquisition because, not only did it give them their own drilling rigs, but allowed them to control and manipulate the books of a major creditor. *Id. at ¶ 42.* Such control was ultimately used to write off significant amounts of Warhorse's debt, thereby hiding Warhorse's worsening financial condition. *Id.*

Utilizing the scheme they had devised, the Kents were able to keep up the outward appearance of being a financially solid, ongoing concern by making material misrepresentations, *Id. at ¶¶ 55-57,* and omissions, *Id. at ¶¶ 60, 61, 63,* about their financial condition and business operations to lure investors, in this case Medve, into remitting money for oil and gas operations-work. They did this under the pretense of continuing to drill wells they either couldn't afford, or, alternatively, might have been able to afford if they hadn't mis-used the money paid to Warhorse in connection with the Granier project. *Id. at ¶¶ 67-71.* These actions resulted in a massive accumulation of liens on wells which Warhorse served as both operator and part working interest owner because of their non-payment of, at a minimum, their working interest cash-call percentages. *Id at ¶¶ 72,73.* Medve argues that this accumulation of liens finally culminated in four out of the five entities involved in this multi-entity fraudulent scheme declaring bankruptcy, with a massive aggregate disparity in the amount of debt they owed versus the assets they claimed. *See,*

*Bankruptcy schedules for Crown Drilling, Inc; Warhouse Drilling Acquisitions II, LLC, Warhorse Oil & Gas, LLC, and Wildcat Drilling, LLC.*[3]

On October 5, 2018, the Kents filed the instant motion to dismiss the claims against them set forth in Medve's First Amended Complaint. In their motion, the Kents argue that the Amended Complaint fails to allege that they fraudulently misrepresented facts sufficient to pierce the corporate veil of Warhorse and fails to sufficiently allege that Warhorse is the Kents' alter ego.

In response, Medve contends that the foregoing allegations set forth in the Amended Complaint demonstrate a fraudulent scheme lasting for over a year that required "the integrated, centralized control of multiple businesses by the same people" (Steven and Jana Kent) who "utilized a combination of misrepresentations and material omissions with the intent to obtain an unjust advantage." *R. 47, p. 8.* Therefore Medve states, these allegations support its claims that the Kents' had complete and exclusive control over all business decisions and financial dealings

---

[3] (1) U.S. Bankruptcy Court record, Western District of Louisiana, Case No. 4:16-bk-51321, provides that Crown Drilling, Inc. filed Chapter 11 Involuntary Bankruptcy on September 23, 2016. *R. 1.* On February 8, 2017, the court granted Crown Drilling's motion to convert the case to Chapter 7. *R. 50*; (2) Case No. 4:17-bk-50402, provides that Warhorse Drilling Acquisitions II, LLC filed Chapter 7 Voluntary bankruptcy on March 30, 2017. *R. 1.* The debtor's total liabilities were found to be $ 2,241,630.00 *R. 18*; (3) Case No. 4:17-bk-51631, provides that Warhorse Oil & Gas, LLC filed Chapter 7 Voluntary Bankruptcy on December 15, 2017. *R. 1.* On August 14, 2018 the bankruptcy court entered an order granting a Rule 2004 examinations relevant to the financial affairs of the Debtor and the Debtor affiliates (Warhorse and the Kents) that are discoverable pursuant to F.R.B.P. 2004, including the Kents' non-privileged financial and tax documents as well as documents and communications related to acquisition and transfer of various assets and/or becoming a co-debtor as to Crown Drilling, Inc., Warhorse Drilling Acquisitions, II, and Wildcat Drilling, LLC, *R. 139*; (4) Case No. 4:18-bk-50119 record provides that Wildcat Drilling, LLC filed Chapter 7 Voluntary Bankruptcy on February 1, 2017. *R. 1.* Wildcat filed a Notice of Abandonment which included its Open Invoices on Warhorse Oil & Gas in the amount of over $3.6 million. *R. 17.*

over Warhorse's direction and finances during the time frame of the fraudulent scheme in question. *Id.*

## II. Legal Standard

### A. *Failure to State a Claim*

To survive a Rule 12(b)(6) motion to dismiss, the plaintiffs must plead enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc*., 565 F.3d 228, 232–33 (5th Cir.2009. But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 129 S.Ct. at 1949–50.

A legally sufficient complaint must establish more than a "sheer possibility" that plaintiffs' claim is true. *Iqbal*, 129 S.Ct. at 1949–50. It need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Twombly*, 550 U.S. at 555. In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the

plaintiffs' claim. *Lormand*, 565 F.3d at 255–57. If there are insufficient factual allegations to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n. 9 (5th Cir.2007), the claim must be dismissed.

### B. Fraud

Pursuant to Fed. R. Civ. Pro. 9(b), a claim for fraud must be pled with particularity greater than that of other claims not alleging fraud. As a general rule, Rule 9(b) requires allegations of the particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir. 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1297, at 590 (1990). "What constitutes 'particularity' will necessarily differ with the facts of each case." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). "[T]he pleading requirements of Rule 9(b) are relaxed where [] the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." U.*S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997); *United States ex. rel. Russell v. Epic Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir.1999), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 931

8

(2009)). ("We have held that when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the Rule 9(b) standard is relaxed, and fraud may be pled on information and belief, provided the plaintiff sets forth the factual basis for his belief."). In such instances a plaintiff may even plead fraud based upon information and belief, as long as the complaint "set(s) forth a factual basis for such belief", *id.*, that is sufficiently detailed enough to "[p]ut the (opposing) party on notice as to the nature of the claim." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1029 (N.D. Miss. 1993); *see also Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F.Supp.3d 493, 507 (E.D.La., 2015) (citing *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir.1994)).

### III. Analysis

#### A. Fraud to Pierce the Corporate Veil

Although there are clear differences in form, "[t]he same policy considerations in piercing the veil of a corporation apply to a limited liability company." *Imperial Trading Co. v. Uter*, 837 So.2d 663, 669 n. 7 (La.App. 1st Cir.2002) (citing Susan Kalinka, *Louisiana Limited Liability Companies and Partnerships*, § 1.32, pp. 80–81 in 9 La. Civ. Law Treatise (3d ed.2001)); *Hamilton v. AAI Ventures, LLC*, 768 So.2d 298, 302–03 (La.App. 1st Cir.2000) (affirming a state district court's judgment piercing the veil of a limited liability company); *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 385 (5th Cir. 2000)

9

(Louisiana law permits "piercing the corporate veil" of a Louisiana limited liability company on an alter ego basis).

"[A]s a general proposition, the law considers a [limited liability company] and the member(s) comprising the [limited liability company], as being wholly separate persons." *Ogea v. Merritt*, 130 So.3d 888, 894–95 (La. 2013) (citing La. Civ. Code art. 24). In general, members of a limited liability company are not liable for the debts, obligations, or liabilities of the limited liability company. The liability of a limited liability company's members and managers is governed by Louisiana Revised Statute § 12:1320, which provides:

> ... (B) Except as otherwise specifically set forth in this Chapter, no member, manager, employee, or agent of a limited liability company is liable in such capacity for a debt, obligation, or liability of the limited liability company.... (D) Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.

La. Rev. Stat. § 12:1320. Thus, La. Rev. Stat. § 12:1320(D) is the exception to the general protection afforded to members of a limited liability company in instances of fraud, breach of a professional duty, or negligent or wrongful acts. La. Rev. Stat. § 12:1320(D); *Ogea,* 130 So.3d at 897. Medve contends

that the exception to the Kents' shield of limited liability applies in this case based on the Kents' alleged fraudulent representations and omissions.

The Kents contend that Medve's Amended Complaint fails to state a claim for fraud against them individually in order to pierce the corporate veil or to allege alter ego. *R. 42.* They claim that individual members of an LLC can only be held liable for fraud perpetrated through their LLC if they themselves ***personally*** make the material misrepresentations a complaint alleges to be fraudulent. They continue to rely on *Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*, 97 So. 3d 595, 599 (La. App. 1 Cir. 7/10/12), in stating that "[u]nder Louisiana LLC law, the fraud exception to the corporate veil is limited to circumstances under which the defendant 'personally' makes such fraudulent representations to a plaintiff."

Under Louisiana law, fraud is a "misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953; *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc*., 178 F.Supp.3d 390, 401 (E.D. La. 2016). The requisite elements of a fraud claim are: "(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially

11

influencing the victim's consent to (a cause of) the contract." *Jones v. Herlin,* 2013 WL 5270547, at *5 (W.D. La. Sept. 17, 2013).

While the Kents maintain that under the ruling in *Charming Charlie*, liability under § 12:1320(D) requires that they must have ***personally*** made the alleged representations, misrepresentations or omissions in order to find fraud under § 12:1320(D), neither the definition of fraud, requisite elements of a fraud claim, nor the terms of § 12:1320(D) have any requirement that allegedly fraudulent material misrepresentations must have been made by the party against whom a claim of fraud is directed. Rather, in *Riggins v. Dixie Shoring Co., Inc*., the Louisiana Supreme Court noted that piercing the corporate veil on an alter ego "usually involves situations where fraud or deceit has been practiced by the shareholder <u>acting through the corporation</u>." 590 So.2d 1164, 1168 (La.,1991) (emphasis supplied). In *Ogea*, the Louisiana Supreme Court stated, "when individual member(s) of a juridical entity such as an LLC <u>mismanage the entity or otherwise thwart the public policies</u> justifying treating the entity as a separate juridical person, the individual member(s) have been subjected to personal liability for obligations for which the LLC would otherwise be solely liable. When individual member(s) are held liable under such circumstances, it is said that the court is 'piercing the corporate veil.'" 130 So.3d at 895.

12

Based on the foregoing, the Court agrees with Medve that *Charming Charlie* "does not enshrine a rule of law" requiring that the member(s) of the limited liability company must have personally made representations or misrepresentations to be liable under La. R.S. § 12:1320(D).[4] Indeed, the jurisprudence is replete with cases exemplifying individual liability of a shareholder or member whose fraudulent actions were made through the corporation or company. "The Fifth Circuit has repeatedly held that an officer may not use the corporate shield when he commits fraud or intentional torts." *J&J Sports Productions, Inc. v. Mallet Enterprises, Inc*., 2017 WL 6559887, at *2 (E.D.La., 2017). Thus, there is no need to pierce the corporate veil when an officer of a corporation commits a fraudulent act or intentional tort. *Id.* (citing e.g., *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed.Appx. 775, 794-95 (5th Cir. 2007) (Holding that "the fiduciary-shield doctrine" did not prohibit the corporate officer from being held personally liable for his own tortious conduct); *Union Carbide Corp. v. UGI Corp*., 731 F.2d 1186, 1189–90 (5th Cir. 1984). Here, Medve's allegations as to the Kents' actions while acting through their various companies, set forth a factual basis for such belief that is sufficiently detailed enough to put the Kents on notice as to the nature of the claims against them.

---

[4] In its Opposition memorandum, Medve states that the facts of this case are distinguishable from *Charming Charlie* because there only one managing member existed for the LLC and only that member could have made the alleged misrepresentations to plaintiff, whereas in this case both members are alleged to have directed the commissions of the fraud in question.

Medve also analogizes the acts of the Kents through their LLC, Warhorse, to Louisiana law recognizing that a principal can be liable for the fraudulent misrepresentations of its agents in a variety of circumstances, including imputing liability to the agent's principal when they knew of the fraud, but were not the driving force behind the fraud in question. *See Lou-Con, Inc. v. Gulf Bldg. Services, Inc.*, 287 So.2d 192, 199 (La.App., 1974) (quoting Restatement of the Law of Agency 2d, § 231, "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud"). Considering these agency law principles Medve asserts that its allegations of the fraudulent scheme devised and implemented for over a year by the Kents, which they effectuated via the LLC through their employees or agents, serves to impose individual liability under 12:1320(D).

Louisiana recognizes broader parameters for acts of fraud committed in the commercial context, such as in this case. Courts have recognized that fraud committed in the commercial context often occurs over "[a]n extended period of time" and can be perpetrated by  acts and devices that a plaintiff who does not have an "insider relationship" cannot be expected to know because a "[p]laintiff cannot be expected to have personal knowledge of the details of (a) corporat(ion)'s internal affairs." *U.S. ex rel. Johnson v. Shell Oil Co*., 183 F.R.D. 204, 207 (E.D. Tex. 1998);

14

*see also, Wool v. Tandem Computers, Inc*., 818 F.2d 1433, 1439 (9th Cir.1987); C. Wright & A. Miller, § 1298 at 416. Thus, as previously stated, courts have relaxed the 9(b) rule when factual information is peculiarly within the defendant's knowledge or control. *See e.g. Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3rd Cir. 1989); M*oore v. Kayport Package Express, Inc*., 885 F.2d 531, 540 (9th Cir.1989); *Michaels Building Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir.1988); *DiVittorio v. Equidyne Extractive Industries, Inc*., 822 F.2d 1242, 1248 (2d Cir.1987).

In a complaint alleging fraud that incorporates these aspects, Rule 9(b) is satisfied where a plaintiff has alleged "[t]he basic framework, procedures, (and) nature of the fraudulent scheme, (as well as) the financial arrangements and inducements among the parties…that give rise to (the) belief that fraud has occurred," *U.S. ex rel. Hebert v. Dizney*, 295 F. App'x 717, 723 (5th Cir. 2008), "with the requisite specificity to generate a strong inference of [fraudulent intent]." *7-Eleven Inc. v. Puerto Rico-7 Inc*., 2008 WL 4951502, at *5 (N.D.Tex. 2008); *see also Wexner v. First Manhattan Co*., 902 F.2d 169, 172 (2d Cir. 1990).

Accepting the factual allegations in the Amended Complaint as true and drawing all reasonable inferences in favor of the Plaintiff, which this Court must, the Court finds that Medve's allegations set forth a plausible claim for piercing the company veil of Warhorse.

B.  *Alter Ego*

Medve also alleges that Warhorse is the alter ego of the Kents. The Kents argue that Medve's alter ego claims should be dismissed as unsupported by sufficient factual allegations.

To prove alter ego liability, a plaintiff must "prov[e] that the shareholders disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves." *Id.* The Louisiana Supreme Court has delineated several factors relevant to an alter ego analysis:

> Some of the factors courts consider when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings.

*Aker Solutions, Inc. v. Shamrock Energy Solutions, LLC,* 2016 WL 4529828, at *3 (E.D.La., 2016). These factors are merely illustrative, not exclusive— the totality of the circumstances is determinative. *See Riggins*, 590 So .2d at 1168; *Hollowell*, 217 F.3d at 387.

Medve contends that its Amended Complaint "clearly and unequivocally" alleges four of the five non-exhaustive *Riggins* factors. The Kents oppose Medve's contention claiming that Medve has failed to allege

16

any conduct that could implicate even one of the *Riggins* factors in a manner

that would support piercing the corporate veil in this case.

In its Amended Complaint, *R. 41, ¶¶ 29 a.-d.,* Medve specifically addressed

the four *Riggins* Factors, alleging the following:

1. *Riggins Factor Number 1—Commingling of corporate and shareholder funds*:

In Amended Complaint Exhibit 9, Warhorse's operations account transaction

records, Medve alleges that the Kents utilized Warhorse's operations account for a

variety of expenses that were either of a clearly personal nature, or not in connection

with the business of an oil and gas operator, as shown on the highlighted transactions

in the attached excerpt of Warhorse's operations account transaction records. *R. 41-9.*

Citing *Harris v. Best of Am. Inc.*, the Kents argue that Medve fails to

demonstrate comingling because "commingling occurs when an individual deposits

the entity's business funds in their personal account or vice versa to the extent that

it becomes difficult to determine whether the funds belong to the business or the

individual" …. "no commingling occurs where separate accounts [were] maintained

even though loans given to owner." 466 So. 2d 1309 (La. Ct. App. 1985). The court

in *Harris,* however, found that it was "clear from the record that separate banking

accounts were maintained" and that "the questioned fund transfers… were explained

as loan transactions" by the evidence adduced. *Harris* at 1315-1316, fn 6.

17

Similarly, in *Sea Tang Fisheries, Inc. v. You'll See Sea Foods, Inc.*, 569 So. 2d 992 (La. Ct.App. 1990), the appellate court relied on actual evidence heard by the trial court in finding a company's payment of the owner's residential utilities was insufficient to satisfy the commingling factor. The court relied on the fact that the residence in question "[w]as to be used as the corporation's base of operations" and such payment was based on a stockholder vote.

Contrary to *Harris* and *Sea Tang Fisheries*, in this case Medve cites the full transactions record for the Warhorse Operations account from 2015 forward in alleging that the Kents used the corporate operations account for a "variety of expenses" that were "either of a clearly personal nature, or not in connection with the business of an oil and gas operator." *R. 41, ¶ 29(a); 41-1*. The record indicates dozens of unexpected expenses which appear to be personal in nature. [5]

2. *Riggins Factor Number 2—Failure to follow statutory formalities for incorporating and transacting corporate affairs*:

Medve cites Exhibit 2 of the Amended Complaint, Warhorse Op. Agreement, alleging (i) Failure to file Warhorse's most recent annual report with the Louisiana Secretary of State; (ii) Failure to follow the Warhorse Operating Agreement's procedures for the delegation of managerial authority which require a written delegation of the same; and (iii) Failure to maintain appropriate accounting practices,

---

[5] Notably, expenses included payments to various restaurants, auto and tire companies, Direct TV, Bowie Outfitters, Pokie's Archery, Avoyelles Outdoors, Cabela's, Cow Town Feed and Supply.

eg., the Kents employed substandard accounting practices that left millions of dollars unaccounted for in contravention of the Warhorse Op. Agreement Sec. VI; 6.2.

The Kents argue that under Louisiana law, "only one" formality is "necessary to the creation and existence of the corporation," which is "the filing of its articles of incorporation by the secretary of state." 8 La. Civ. L. Treatise, Business Organizations § 32:3 Corporate Formalities in Veil-Piercing. They contend that Medve's allegations "nitpick" at Warhorse's business practices but fail to show that Warhorse was not properly incorporated, or that it "failed to do business on a corporate footing."

More specifically, as to Medve's allegation that no annual report had been filed this year, the Kents' state that Warhorse had already filed bankruptcy by the time the report was due. In response, Medve cites *Parkpoint Real Estate Inv., L.L.C. v. Super Bounce Playhouse, LLC*, 2014 WL 1203111, at *5 (La. Ct. App. Mar. 24, 2014) in which the court concluded that Plaintiff's Amended Petition alleging a failure to file annual reports under La. R.S. §12:1308 was a cognizable statutory violation for purposes of piercing the company veil.[6] Further, Medve states that

---

[6] La. R. S. § 12:1308.2 (E)(2) states:

(2) Each limited liability company which is not in good standing shall be prohibited from engaging in commercial business operations with the state or its boards, agencies, departments, or commissions. Any contract between the state or its boards, agencies, departments, or commissions and a limited liability company which is not in good standing may be declared null and void by the board, agency, department, commission, or the division of administration.

"nothing in the LLC code provisions state that an LLC is absolved of this statutorily imposed duty as a result of bankruptcy.[7]

Medve also alleged that the Kents improperly orally delegated managerial authority to non-members. A statutorily mandated act for the management of an LLC by its members is that it "[s]hall be managed by the members, subject to any provision in a written operating agreement restricting or enlarging the management rights and duties of any member or group or class of members." La.R.S. § 12:1311.[8] As the Warhorse Operating Agreement provides that delegations of managerial authority to non-managers must be in writing to be in compliance with its terms,[9] Medve's allegation that the Kents delegated such authority in the absence of a written memorialization is likewise a failure to follow statutory formalities.

As to Medve's allegations that the Kents employed substandard accounting practices in their management of Warhorse that left millions of dollars unaccounted for, Louisiana courts have considered a failure to institute and maintain minimally

[7] While not alleged in the Amended Complaint, Medve states that "Warhorse failed to timely file four of its five statutorily mandated annual reports, three out of four of which were filed significantly later than the statutorily imposed deadline of the anniversary of filing for registration."

[8] In Louisiana, the general rules governing LLCs are stated in La. R.S. 12:1301, et seq. La. R.S. 12:1311 (Management by members) states:

> Except as otherwise provided in the articles of organization, the business of the limited liability company shall be managed by the members, subject to any provision in a written operating agreement restricting or enlarging the management rights and duties of any member or group or class of members.

[9] Warhorse Operating Agreement Section 3.2 (Managers) states, Upon mutual and written consent of the Members, a manager (who may also be a Member) may be appointed to conduct limited business on behalf of the Company; however, the scope and authority of any appointed Manager shall be explicitly set forth, in writing, and signed by each Member. *R. 41-2.*

20

adequate accounting practices as a factor weighing in favor of applying the Alter-Ego doctrine to pierce the company veil. In *Dillman v. Nobles*, the court held that while a cash system of bookkeeping alone is not necessarily suspect, a shareholder's "complete control over the removal of [funds] constituted such a loose financial arrangement that nothing whatever prevented [the owner] from transferring any or all of the cash out of the corporation." 351 So. 2d 210, 214 (La. Ct. App. 1977). Thus, the court held the accounting practice weighed in favor of piercing the corporate veil. *Id.*

      *3. Riggins Factor Number 3—Undercapitalization*:

      Medve alleges that while the Kents, via Warhorse, took out the Second Business First Loan for over $3 million, they still left Warhorse undercapitalized by one or more of the following acts as evidenced in Exhibits 10 and 12 of the Amended Complaint: (1) The Kents' failure to deposit those funds into a Warhorse account, *R. 41-10*; (2) The Kents actions allowed liens to occur on Granier that exceeded the total of all of Warhorse's portion of cash-calls, so, the Kents, via Warhorse, never paid anything for the goods and services secured by said liens, as they did not have the funds; and, (3) The Kents were over $4 million in debt to Wildcat, their own company. Thus the only impediment to payment was lack of money to do so. *R. 41-12*.

The Kents argue that Medve's claim that Warhorse was undercapitalized is "barebones and conclusory." They contend that in order to adequately allege undercapitalization under *Riggins,* a plaintiff must at least set forth allegations that an individual defendant was "deliberately keeping [the LLC] undercapitalized or depleting its assets." *Provosty v. ARC Const., LLC,* 119 So.3d 23, 36 (La.App. 4 Cir., 2013).

The Court disagrees with the Kents' assessment of the allegations related to the undercapitalization of Warhorse. Based on the Complaint as amended, the Court finds that Medve has sufficiently alleged that the Kents' actions resulted in Warhorse's undercapitalization.

   *4. Failure to provide separate bank accounts and bookkeeping records*:

Medve alleges the Kents had only one Warhorse account for each of the following—drilling; production; and, operations. Therefore, they were commingling joint operating accounts for various wells they operated despite needing to perform these functions for each individual well for which they served as operator.

The Kents argue that under *Riggins*, the fourth factor is merely "whether an entity has *a* bank account separate from its owners' personal account, not whether it has multiple bank accounts attributable to its various functions." Medve contends that the Warhorse Operating Agreement requires that the Granier's funds be kept in separate accounts. *R. 41-2.* Section 6.2 (Accounting Practices) of the Warhorse

Operating Agreement states, "The books and records shall be kept in accordance with good accounting practices applied on a consistent basis, shall reflect all of the Company's transactions, and shall be appropriate and adequate for the Company's business." *R. 41-2.* The Court finds that Medve's allegation related to commingling all of the joint operating accounts for all of the various wells is sufficient to state a plausible claim under this *Riggins* factor.

### C. Single-Business Enterprise

Louisiana law is determinative of whether entities constitute a "single business enterprise." *See, e.g., Green v. Champion Ins. Co.*, 577 So.2d 249, 257 (La. App. 1 Cir. 1991). In *Brown v. ANA Insurance Group*, the Louisiana Supreme Court explained that the Single-Business Enterprise doctrine is "a theory for imposing liability where two or more business entities act as one." 994 So.2d 1265, 1266, n. 2 (La. 10/14/08) (citing *Green*, 577 So.2d 249). Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Id.* In *Green*, the Louisiana Court of Appeal for the First Circuit set forth eighteen factors that may be used to determine whether a group of entities constitutes a single business enterprise. 577 So.2d at 257-258. The list is illustrative and not

exhaustive, and no one factor is dispositive.[10] If a group of entities is found to be a single business enterprise, then the court may disregard the concept of corporate separateness to extend liability to each of the affiliated corporations to prevent fraud or to achieve equity. *Id*. at 259.

Medve asserts that its allegations in the Amended Complaint support its claim for piercing the veil of Warhorse to find the Kents liable under the Single-Business Enterprise doctrine. The Kents argue that this claim does not apply to them because Louisiana law's single business doctrine only permits a business or businesses to be held responsible for the debts of another business, not individuals as alleged in this case.

Medve contends that the jurisprudence is unclear as to whether the Single-Business Enterprise doctrine applies only to a business or businesses and not to an individual or individuals. It cites *Dishon v. Ponthie*, 918 So. 2d 1132, 1136 (La. Ct. App. 2005) as applying the single business enterprise theory of veil-piercing against an individual who owned two separate businesses. The Kents argue that Medve

---

[10] The factors are: 1. Corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control, 2. Common directors or officers, 3. Unified administrative control of corporations whose business functions are similar or supplementary, 4. Directors and officers of one corporation act independently in the interest of that corporation, 5. Corporation financing another corporation, 6. Inadequate capitalization ("thin incorporation"), 7. Corporation causing the incorporation of another affiliated corporation, 8. Corporation paying the salaries and other expenses or losses of another corporation, 9. Corporation receiving no business other than that given to it by its affiliated corporations, 10. Corporation using the property of another corporation as its own, 11. Noncompliance with corporate formalities, 12. Common employees, 13. Services rendered by the employees of one corporation on behalf of another corporation; 14. Common offices; 15. Centralized accounting, 16. Undocumented transfers of funds between corporations, 17. Unclear allocation of profits and losses between corporations, and 18. Excessive fragmentation of a single enterprise into separate corporations.

misstates the holding of *Dishon*. The Court agrees. Rather than applying the single business enterprise doctrine against an individual as Medve contends, the court in *Dishon* held that there could be "no personal liability on the part of Ponthie," the individual owner of two companies who controlled both businesses, but that each <u>business</u> in the enterprise could be liable for the debts of its affiliate company. 918 So. 2d at 1135-36. The Court finds that the Single-Business Enterprise doctrine does not apply to the Kents in this case.

## IV. Conclusion

For the reasons provided in the foregoing, the Court recommends that Defendants, Steven W. Kent II and Jana Kent's, Motion To Dismiss [Rec. Doc. 42] be DENIED IN PART AND GRANTED IN PART, in that the Motion as to Plaintiff, Medve Energy Ventures, LLC's, claim for Single-Business Enterprise be GRANTED and the Motion as to Plaintiff, Medve Energy Ventures, LLC's, claims for Fraud To Pierce the Corporate Veil and for Alter-Ego be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

**THUS DONE AND SIGNED** this 21st day of November, 2018 at Lafayette, Louisiana.

_____
**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**